# GRAFTON,

## JULY TERM, A. D. 1850.

---

### CARLETON *v.* REDINGTON & *a.*

Where C., who was the owner of a mill-site upon a river, by deed conveyed to E., R., & F., a tract of land on both sides of said river, by metes and bounds, "together with the right of raising the water in said river above, or on the easterly side of said land herein granted, by damming said river, at the water-fall on said land, to such a height as may not interfere, except in extremely high water in times of freshet, with the operation at the mill-dam next higher up on said river, of machinery now there in operation, or which may hereafter be put in operation there at a perpendicular depth not greater than that of the machinery now there in operation;" it was *held,* that a parol agreement giving the grantees the right, by means of a dam, to raise the water to a greater height than was contemplated by the deed, cannot legally have that effect, either as a binding contract, or as conclusive evidence of the rights of the respective parties under the deed.

A parol license to be exercised upon the land of another, is a mere personal privilege, founded in personal trust and confidence, and is not assignable.

A license to *erect* a dam, and flow the lands of another, terminates with the decay of the dam, and gives no right, when the dam has become decayed and ruinous, to reërect or repair the dam, and reflow the land.

When a dam is erected, and the land of an individual is flowed to a greater extent than the person who erected and owned the dam has a right to do, no action can be maintained against the grantee of such owners for continuing such dam as it was at the date of the purchase, and flowing the land as before, except on notice of the nuisance, and request to remove or abate it.

Where at the time of such purchase, there were "flash-boards" upon the dam, and afterwards the "flash-boards" were removed, and timbers of a permanent character were placed upon the dam, by the grantee, causing the land above to to be flowed and injured, it was *held,* that the grantee was liable to an action for the injury, without any such notice or request as aforesaid.

No particular form of notice is required in such case.

It may be either written or verbal, or it may be by acts alone, clearly informing the party to be affected by it, of the fact of the existence of the nuisance, and of the desire of the party injured, for its removal.

CASE, for maintaining a dam across the Amonoosuc River in Littleton, and thereby causing the water and ice to be thrown back upon the wheels of the plaintiff's mill for manufacturing lumber, situate on the river above, and obstructing the working of said mill from the 3d day of August, 1840, to the 3d day of August, 1846.

The plaintiff laid before the jury evidence tending to sustain the counts in his writ.

The defendants introduced a deed, dated June 23d, 1835, from the plaintiff to the defendants, George W. Ely and George B. Redington, and to John Farr, by which he conveyed a tract of land on both sides of said river, by metes and bounds, " together with the right of raising the water in said river, above or on the easterly side of said land herein granted, by damming said river at the waterfall on said land, to such a height as may not interfere, except in extremely high water in times of freshet, with the operation at the mill-dam next higher up on said river, of machinery now there in operation, or which may hereafter be put in operation there, at a perpendicular depth no greater than that of the machinery now there in operation." Also, a deed dated June 24th, 1840, from George W. Ely and George B. Redington, to Henry C. Redington, of one undivided third part of " the tract of land in said Littleton, which was conveyed to us and John Farr, by deed of Sylvanus Balch, dated November 27th, 1835, and by deed of said Balch, of August 20th, 1836, and by deed of Edmund Carleton, Jr., dated June 3d, 1835, to which deeds reference is had for a description, together with the scythe-factory, houses, and other buildings, and our interest in the oat-mill and appurtenances thereon standing."

It appeared that said Ely, Farr, and Redington, soon after the date of Carleton's deed to them, erected the dam in question, upon the land conveyed to them by him, for the purpose of driving the machinery of a scythe-factory, which, with various other buildings, they soon after erected a little below said dam ; but it did not appear that the scythe-factory was upon the land conveyed by the plaintiff, or on that conveyed by Balch, nor was any question made at the trial in regard to that point.

Carleton v. Redington.

No deed was shown from the plaintiff dated June 3d, 1835. The plaintiff contended that the deed of June 24th, 1840, did not connect Henry C. Redington with the grant from the plaintiff by his deed, dated June 23d, 1835; but the court overruled the objection.

The plaintiff's evidence tended to prove that the defendants maintained their dam at such a height, as to cause back-water and ice to interfere with the machinery of the plaintiff's mill at other times than "in extremely high water in times of freshet."

The defendants offered to prove, that just before their dam was built, in August, 1835, the parties agreed upon a certain monument to which the grantees might raise their dam, and that they had not maintained their dam any higher than that point.

The plaintiff objected, that it was not competent to prove such agreement by parol evidence, so as to give the grantees a right to raise the water higher than they could have done by the terms of the deed. But the court ruled, that the parties might fix by their verbal agreement a limit to their respective claims, different from that which might be considered the true construction of the deed, and admitted the evidence.

Two witnesses testified in relation to this point, in substance, that they built the dam for Ely, Farr, and Redington, and before they commenced, Ely told them to go to the plaintiff, as expressed by one of the witnesses, to get a boundary to level from, a monument to level to, and, as expressed by the other, a point to start from in building the dam. They went to the plaintiff, who was at his mill, and made known their business; but could not tell, whether they did or did not inform him by whose direction they came; that the plaintiff went with them, and they had a conversation with him, to ascertain how high they could build the dam, and how high he would admit the water to be flowed at his mill. He said they might flow as high as the under side of the stream mud-sill of his saw-mill, and the witnesses then took levels from that point down to the place of the dam, and the plaintiff was present while they took the first levels; that they built the dam nearly to the height of the bottom of the sill, and when it was completed and filled with water, they went up to the plaintiff's

Carleton *v.* Redington.

mill, where he and they went together to see how far the water was raised, and found that it did not rise so high as the under side of the sill, and the plaintiff said he was perfectly satisfied with it; that they informed Ely how they found the water, but could not tell what he said. Neither of these witnesses could tell the precise language which they used to the plaintiff, or that which he used to them, or what either said, except as above stated. One of them testified that Ely went with them to the plaintiff, but said nothing; the other, that Ely did not go with them.

It appeared that the dam remained at its original height till the summer of 1838, when a freshet washed away a portion of the timbers which supported it, and one of the main bottom timbers was broken by reason of the pressure upon it; and in consequence, the dam settled, and did not raise the water so high as before.

It appeared that " flash-boards," so called, were occasionally put upon the dam, in very low stages of the river, for the purpose of raising the water, till 1842. The plaintiff's tenants and hired men at the mill, complained to him of the use of these boards, and he told them to take them off whenever they found them upon the dam, and they did so in repeated instances.

Ely and George B. Redington several times applied to the plaintiff's tenants and to him, for leave to put on flash-boards, and permission was sometimes given to use them a few days at a time in low water.

In the spring of 1842, the factory first built was burnt, and the defendants erected another the same season. Afterwards, in July, 1842, the defendants put upon the dam some sticks of timber, for the purpose of raising the water higher than it was raised by the dam, and these or similar sticks remained upon the dam till the suit was brought.

No evidence was offered of any express notice to either of the defendants to remove them.

The plaintiff contended, that it would not be competent for the jury to find upon this evidence, such an agreement as the defendants alleged; but the court instructed the jury that the

evidence was competent for them to consider, and if from that they believed that such an agreement was actually entered into, both parties would be bound by it, notwithstanding the phraseology of the deed.

The defendants also contended, that if the jury should not be satisfied that there was a binding agreement between the parties, yet that they might find a license to raise the water to the under side of the sill; and if the defendants had not exceeded that limit, the plaintiff could not recover, inasmuch as he had not revoked the license. On the other hand, the plaintiff contended that the dam having settled, and the factory having been burnt, no revocation was necessary; and the defendants could not, without a new license, after this add to the height of the dam so as to raise the water as high as it was originally.

The court instructed the jury, that if they were satisfied the plaintiff gave to the original owners of the scythe-factory a license to erect their dam of the height to which it was built at first, and that the license was not revoked in fact, and that the dam had not been raised above the height so licensed, the defendants were entitled to a verdict, notwithstanding the burning of the factory and the settling of the dam.

The plaintiff also requested the court to instruct the jury, that a license is founded in personal confidence, and is not assignable, and so, if proved, could not protect Henry C. Redington; but the court instructed the jury, that in a case like this the license would protect the assignee until notice given to him to remove the nuisance.

The defendants contended, that no action could be maintained against Henry C. Redington for continuing to maintain the dam at the height at which it was in June, 1840, when he purchased, unless he was notified to remove or reduce the height of the dam. The plaintiff contended that if Redington understood from the plaintiff's conduct in respect to the flash-boards, or in any other way, that he was not willing they should raise the water as high as before, this was sufficient notice, and requested the court so to instruct the jury. But the court declined to give such instruction, and charged the jury, that actual notice

to H. C. Redington in the common acceptation of that term, was necessary to enable the plaintiff to maintain his action against him ; and·it was not sufficient that said Redington should have understood from plaintiff's conduct that he .was unwilling the dam should be continued.

To the several rulings and instructions aforesaid, the plaintiff excepted.

· The jury returned a verdict for the defendants, and the plaintiff moved that the same be set aside and a new trial granted, on account of said exceptions ; and thereupon,

It was ordered, that the questions arising in the foregoing case be reserved and assigned for the decision of this Court.

*C. R. Morrison*, for the plaintiff.

1. The ruling was incorrect, that the parties might fix by their verbal agreement, a limit to their respective claims, different from what might be considered the true construction of the deed. The question is not one of *boundary* between adjoining lots, and the case does not come within the decisions on that subject. It was not intended to convey a right of flowage by any *fixed bounds,* but only such privilege as could be enjoyed. without injury to the plaintiff except in extremely high water in times of freshets. A verbal agreement upon a *monument* to which the grantees might raise their dam, if at such height it would cause the water to interfere with the operations of the plaintiff's mill at·other times than those specified in the deed, would be inconsistent with the deed and in violation of the statute, and could have no greater force than a verbal license. 1 Greenl. Ev. ch: 15, § 275 ; *Whitney* v. *Eames,* 11 Met. Rep. 517 ; N. H. Laws, (ed. of 1830,) p. 535.

2. It would not be competent for the jury to find, upon the evidence, such an agreement as the defendants alleged.

3. Conceding that the evidence tends to prove a verbal license at the time the dam was built, we say that the license had no application, except in respect to the *increased* height beyond what was warranted by the deed. The *grant* gave a right to build a dam, though, perhaps, it was made *higher* than it would

Carleton *v.* Redington.

have been, but for the *license*. There was no expenditure upon faith of the license, unless in regard to such excess. The dam settled, and the factory erected in connection with it was burned. Therefore the case falls within the rule of law, that a license to erect a dam *terminates with its decay*, and no revocation was necessary. 3 Kent's Com. 452, (5th ed.); *Hepburn v. Mc-Dowell*, 17 Serg. & Rawle, 383; *Ameriscoggin Bridge* v. *Bragg*, 11 N. H. Rep. 109. If, notwithstanding these facts, a revocation was indispensable, what was requisite to constitute a revocation ? Not that the plaintiff at his own expense should reduce the height of the dam, for it had already been reduced by reason of the settling; nor that the plaintiff should refund the expense of the increased height of the dam beyond the grant, for the grantees had enjoyed the benefit of their expenditure, without interruption, until it became inoperative from causes over which the plaintiff had no control. The most that the defendants could require was *information* that the plaintiff did not continue a license for which he had received no equivalent, and which had proved injurious to him; and this they may obtain from his acts, as well as from words. It is enough if the plaintiff's dissent was actually *brought to the knowledge* of the defendants, and it is quite immaterial in what way this was done. Hence, the jury should have been instructed that it was sufficient revocation, if the defendants understood, from the plaintiff's conduct in respect to the flash-boards, or in any other way, that he was not willing that they should raise the water as high as before.

4. The deed of June 24th, 1840, does not connect H. C. Redington with the grant from the plaintiff, and, for this reason, the former is a stranger to it, and has no defence.

5. But even if it does thus connect him, he has no sufficient answer. For if there was not a license to Ely, Farr, and Redington, then H. C. Redington came in as a purchaser of a nuisance already erected, and would not, without notice, be liable for continuing it as high as it was when he bought it, in 1840, but would be liable, because, in 1842, he made it higher, and the jury were so instructed. In like manner, if there *was*

such license, he would be answerable for making the dam higher than it was in 1840, because a license " is founded in personal confidence, and is not assignable," and the jury should have been so instructed. 3 Kent's Com. 452, and cases cited in note. And if notice to him were necessary, it was enough if he understood from the plaintiff's conduct in respect to the flash-boards, or in any other way, that he was not willing that the water should be raised as much as before.

*H. A. & W. J. Bellows,* for the defendants.

1. Carleton conveyed land on both sides of the river, and the right of building a dam at the waterfall on the land granted. This was done, and a scythe-factory erected at that fall.

The conveyance to H. C. Redington refers to this deed for a description, but makes a mistake in the date, in respect to the day of the month, but in all other respects the description is correct: viz., as to the names of the parties, the year, and the month, and also in its reference to the scythe-factory on the premises. This reference to the scythe-factory is conclusive that the deed of June 23d, 1835, was the one referred to, if the scythe-factory stood upon the land conveyed by that deed, as it undoubtedly did; and the misdescription of the date is to be disregarded. *White* v. *Gay,* 9 N. H. Rep. 126; *Lyman* v. *Loomis,* 5 N. H. Rep. 408. It is clear that it was competent for the jury, upon the evidence in the case, to find that the scythe-factory stood on this land. For this deed of Carleton's conveyed the privilege, with land on both sides of the river, and the waterfall at the upper side of it; and the dam was erected upon it. Of course, as no evidence was offered to show that the factory was upon any other land, the presumption would be, that it was upon this, it being a little below the dam; especially as no deed from Carleton, of June 3d, 1840, was shown or suggested, and as H. C. Redington was in possession with the other defendants, in conformity with the grant. In fact, it was assumed by the judge, and not denied, that the factory did stand on this land. If, then, it was competent for the jury to find that it did stand on this land, it is enough; and they might properly disre-

gard the mistake in the deed. Besides, it was not necessary to show that H. C. Redington had title. If Ely and George B. Redington had the right to maintain the dam, no action could be maintained against H. C. Redington on account of an occupation of it jointly with them, as partner, or as a servant. And the suit goes upon the ground that they jointly maintained the dam.

2. It is well settled that a parol agreement of parties, after the execution of the deed, fixing the boundaries of the land, is binding. *Prescott* v. *Hawkins*, 12 N. H. Rep. 19, and cases cited; *Gray* v. *Berry*, 9 N. H. Rep. 473, and cases cited; *Taylor* v. *Waters*, 7 Taunt. 274; *Winter* v. *Brockwell*, 8 East, 308. It is equally well settled, that a parol license to erect and maintain a dam and flow the land of another is, when executed, binding. *Woodbury* v. *Parshley*, 7 N. H. Rep. 237; *Ameriscoggin Bridge* v. *Bragg*, 11 N. H. Rep. 102. If, then, a parol agreement concerning boundaries is valid, it is difficult to conceive why such an agreement touching the extent of an easement upon the land is not also valid.

In this case the defendants had the right to build a dam to flow the plaintiff's land, but not to interfere with him, except in extremely high water in times of freshets. Here the precise height of the dam was not fixed, and in the absence of an agreed monument, could be determined only by experiment; and on account of the looseness of the terms " *interfere* " and " *extremely high water,*" could not easily be fixed in that way. Under these circumstances, the parties fix the height by agreement. They define the extent of the right, by agreeing that the water may be raised upon the plaintiff so much as may be done by a dam of a certain height. The plaintiff's counsel says, if such a dam raises the water so as to interfere with the plaintiff, the agreement would be inconsistent with the deed. If it were so, the same may be said in the ordinary case of agreed boundary, and still that is valid. In that case, and in this also, the parties having by agreement fixed the boundaries and limits of their respective rights, shall not be heard to say, that the agreement does not conform to them.

3. We apprehend it to be clear, that it was competent for the jury to find such an agreement.

4. The license continues in force, unless revoked, until the dam is decayed and becomes worthless as a dam. So long as it can be repaired, it may be kept up to its original height. To hold that it could not be repaired, would be to render the license, in a great majority of cases, of little or no value. The destruction by fire, of the factory, the machinery of which was moved by means of the dam, makes no difference; for so long as the dam can be kept up, the party may apply the power to such purpose as he pleases. He may pull down one, and erect another factory, or, if burnt down, it is the same. The license gives the right to keep up the dam, but has nothing to do with the mode of using the water.

5. The dam was still maintained by Ely and G. B. Redington, two of the persons to whom the license was originally given; and whether it was assignable or not, they had the right to maintain it, and that right was in no way impaired by their having associated H. C. Redington with them. But the rights acquired by such a license are assignable, and pass as appurtenant to the land. There may be cases where the license is founded in personal confidence and cannot be assigned, but this *is not one of them.* Here, upon the faith of the license, large sums of money are expended in making permanent erections, and in the case of dams it is generally so; and yet we apprehend no case can be found, where it has been held, that the death of the party to whom the license is given is a revocation of the license.

6. Actual notice to H. C. Redington to remove the dam, before a suit could be brought against him, was necessary. He must be informed that it was a nuisance, and requested to remove it. Conduct evincing dissatisfaction is by no means equivalent. Redington should have been distinctly notified. But here there was nothing indicating any objection to the *dam,* but only to the use of the *flash-boards.*

WOODS, J. The first question arises upon the ruling of the court, that the parties might fix a limit to their respective claims, different from that which might be considered the true con-

Carleton *v.* Redington.

struction of the deed from the plaintiff to Ely, Farr, and Redington. This ruling was made upon objection to the competency of parol proof of an agreement by the parties, upon a monument, to which the defendants might raise their dam, and which would give the grantees a right to raise the water higher than they could have done by the deed. The question is, whether the ruling, admitting the evidence, was correct. The agreement was, in effect, that the water might be raised upon the premises and works of the plaintiff, to any height to which a dam of given elevation would raise it in any and every state of the water; although it would thus be raised higher, and would flow the lands and works of the plaintiff to a greater extent than was contemplated by the grant. The effect of the proof of the agreement, if it can have effect at all, is to enlarge the grant, in fact, by a parol agreement. The ruling admitted the evidence, notwithstanding it must have that effect. And the question is, whether a parol agreement can have effect as a contract enlarging the rights of the parties, or as conclusive evidence of the existing rights, and of the extent of the existing claims of the parties. It is believed that no case can be found, giving any countenance to the idea that a parol agreement can be allowed to have the effect, directly, to enlarge a grant which is required to be made by deed. If such agreement can affect the grant at all, it must be as matter of evidence of the extent of the respective rights of the parties under the deed, which is conclusive, and the contrary whereof cannot be shown by other proofs. That parol agreements have been allowed to have that effect in regard to divisional lines of the *lands* of adjoining owners in this State, where an agreement has been made, and in conformity therewith, such adjoining owners have erected monuments upon the line, and have gone into actual occupation of the lands on both sides, or where, as it is termed, the agreement has been executed, is not to be denied. *Sawyer* v. *Felton*, 6 N. H. Rep. 107; *Gray* v. *Berry*, 9 N. H. Rep. 473. The same doctrine is holden in a similar case in Pennsylvania. *Ebert* v. *Wood*, 1 Binney, 215. A similar principle is established by the supreme court of New York. *Clark* v. *Wethey*, 19 Wend. 320.

25 *

It seems, however, that the courts of New York are not inclined to extend the principle, but to limit it, as in the case referred to. *Rockwell* v. *Adams*, 16 Wend. 285. But, in the States of Maine and Massachusetts a different doctrine prevails. It has been decided that such agreement, and actual location of a line between owners of adjoining lands, are strong evidence of the accuracy of the line thus established, although not conclusive so as to prevent either party from showing that it was settled erroneously. *Gove* v. *Richardson*, 4 Greenl. 327; *Whitney* v. *Holmes*, 15 Mass. 153. The decisions, then, upon this point, are not agreed; and upon examining them, and the reasons assigned for them, we are not inclined to extend the principle established in this State beyond the cases in which it has already been applied, and certainly not to cases where there is no ambiguity in the terms of the deed, and no difficulty or doubt as to the extent of the rights of the parties under the deed.

Where the terms of the deed are not ambiguous, and the extent of the rights of the parties, under the deed, are plain and evident, to hold that a parol agreement shall in fact enlarge the rights of either party beyond those given by the deed, under the name of conclusive evidence, is nothing more or less than to give such parol agreement the effect of a grant of real estate. A doctrine having any such effect, is in direct contravention of the statute of frauds, and cannot be sustained. That an agreement of the parties should have the effect of evidence, even of *strong* evidence, of the accuracy of the line agreed upon between adjoining owners, is an admissible doctrine; but that it should have the effect, when founded in error in fact, and it is so shown, to enlarge a grant required to be by deed or other writing, is a doctrine which does not approve itself to the judgment by force of any very obvious and controlling reason, or any inherent principle of justice upon which it is seen to rest. We are not, then, prepared to carry the doctrine of the cases referred to, in this State, beyond the cases in which it has been applied, or cases in which the reason for the doctrine is seen to be at least equally cogent and convincing.

The case under consideration is not one of an agreement upon

Carleton *v.* Redington.

a divisional line between *lands* of adjoining owners. The deed does not look to any particular divisional line, or to the establishment of any such line, as forming the limit of the grant, or of the rights of the parties under the grant. But it looks to the practical operation of the water by means of a dam, to be erected by the defendants upon lands of their own, upon the machinery at the mills of the plaintiff, at his mill-dam above the contemplated dam of the defendants, as limiting and determining the extent of the grant and the rights of the parties under it. And it looks, also, to such operation, for that purpose, in all the varying states of the water contemplated by the deed. If any other reason were necessary to be assigned why the doctrine contended for should not be applied to a case like the present, than that it allows of the enlargement of a grant by parol, in contravention of the statute, it will be found, we think, in the fact that the principle must be applied in all cases, and between all parties alike; while at the same time, although it may be that persons learned and skilled in the science of hydraulics might, upon an investigation and a scientific calculation, determine, with some degree of certainty, the height of a dam, by means of which the operation of the water upon the machinery would not be injurious, still, the requisite degree of skill would not be found to exist in any but a very limited portion of such persons as are likely to be parties to conveyances of water-rights, such as are in controversy in the present case. Much wrong and injustice would therefore be likely to be accomplished by the application of such a doctrine to such a case; and much more, we think, than by denying its application. And besides, the denial has the advantage of being sustained by principle, and of being in conformity with the provisions of the law.

The right granted is a right to raise the water; but not so as to interfere with the operation of the machinery of the plaintiff at the mill above, except in extremely high water in times of freshet. The right claimed under the agreement, is a right so to raise the water as to interfere with the operation of the machinery, and beyond the grant. And it is conceded to be so. An agreement, in any case, to affect the rights of the parties, even as to

Carleton *v.* Redington.

divisional lines, must be intended to be an agreement fixing upon the actual, true line, and not intended to change or enlarge the grant. This position is conceded in all the cases.

In the cases in which the doctrine contended for by the defendants prevails, of course an agreement in fact founded in mutual error, is held conclusive evidence that there is no error; or the parties having made the agreement, the error cannot be shown, and thus the grant is in effect enlarged or altered, but not *eo nomine.* If such a doctrine is to prevail in the case of divisional lines of lands, in cases in relation to which parties may be fairly supposed to have competent knowledge to act understandingly, or the *means* of such knowledge, enabling them to act with a reasonable degree of certainty, we think it should not prevail in cases like the present, where it would be most difficult to determine the operation of the water in all its stages, except by actual experiment. Unskilled men would be almost certain to commit errors in such cases. And this would not be the result of any uncertainty or ambiguity in the terms of the grant, or deed, which could be aided by evidence, but only of the difficulty of determining the operation of the water except by experiment. And it is apparent that, without actual trial, or without unusual skill on the part of the parties, any such agreement would be scarcely more than a mere expression of opinion upon the subject. And we think it would be going quite too far to hold, that such expression of opinion, in a matter of so much uncertainty as to the fact, is conclusive evidence of the fact, beyond all control of other evidence showing it to be founded in mere error. If, when parties have acquired rights in real estate by virtue of deeds, it is desirable that they should be enlarged or altered, it is enough that the matter is open for further negotiation; and if it be intended to enlarge, or in any way alter the rights required, it may be done by deed. 17 Maine Rep. 128. When that is required by the law and the decisions of the courts, then all is done that can be done to guard persons, sometimes ignorant, and sometimes injudicious, against the injurious consequences of their own follies or weaknesses. And such, in addition to necessary errors of understanding, the un-

certainty of memory, and, more than all, the danger of false-hood, was the reason for the enactments requiring all convey-ances of real estate to be in writing, and attended, in certain cases, and for some purposes, with the formalities of a seal and witnesses.

It is going far enough, we think, to hold, in a case like the present, that an agreement is evidence to be weighed by a jury in determining whether the parties have exercised rights beyond those granted by the deed when construed by the court; but that it is going quite too far, to hold that such an agreement is conclusive evidence that the right claimed according to parol agreement is the just right granted by the deed, when it is shown by evidence, and is made to appear that it is not, in fact, in accordance with the deed.

It may well be conceded, in the present case, that there was sufficient evidence of a license originally given in 1835 to Ely, Farr, and G. B. Redington, to raise the water to the under side of the "stream mud-sill" at the plaintiff's mills, by means of a dam to be erected upon the land conveyed to them by the plain-tiff; and it may be assumed upon the case that the water was not raised to a greater height than the license, if con-tinued, would justify. But a question arising upon the ruling of the court is, whether, upon the facts reported, the license can be holden to be assignable, and to protect H. C. Redington until notice should be given him to remove the nuisance.

We regard it as well settled, upon the authorities, that a license to be exercised upon land is a personal trust and confi-dence, and is not assignable; and that although it may be bind-ing as between the parties, it will not pass to a purchaser. Mr. Chancellor *Kent* says, such "license is founded on personal confi-dence, and is not assignable nor within the statute of frauds." 3 Kent's Com. (2d ed.) 452, and cases cited in note (*a*). In *Stevens* v. *Stevens*, 11 Met. Rep. 255, Mr. Justice *Wilde* says, "a distinction is made in some of the cases between a personal privilege which is not assignable, and an easement carrying an interest in land." This is an evident recognition of the principle that a license is not assignable; and, from its very nature, being a

Carleton *v.* Redington.

mere permission to one to do an act, it cannot be construed as conferring an authority upon others to do such act, or exercise the same license. *Harris* v. *Gillingham*, 6 N. H. Rep. 11, recognizes the doctrine, that a sale and conveyance of the land upon which the license is to be exercised will operate a revocation of the license, and discharge the land thereof. So, also, of a sale of the erection upon the land made in virtue of the license, that the purchaser acquires no right to occupy it upon the land, but only a right to remove it. So when G., by writing under hand and seal, gave to H. the privilege, during pleasure, to occupy a certain piece of land, and H. afterwards sold the land to C., it was holden that the instrument given by G. was a mere license or personal privilege to occupy, which was determined as soon as H. undertook to convey the premises. *Jackson* v. *Babcock*, 4 Johns. 418. In *Ruggles* v. *Lesure*, 24 Pick. 187, the court say, "licenses are personal, and terminate with the death of either party." A similar principle is recognized in *Seidensparger* v. *Spear*, 17 Maine Rep. 123; *Ex parte Coburn*, 1 Cowen, 368; Sheppard's Touchstone, 231. It would seem quite clear, then, that the conveyance to H. C. Redington by Ely and G. B. Redington of June 24, 1840, gave him no interest or benefit in the license, and, consequently, could not, of itself, be held to furnish him any ground of defence in this action. In fact, such a license to a person is nothing more than an authority to do a particular act or series of acts upon the land of another, without giving him any estate therein, or authority to license others to do or exercise the same right; and being holden to be founded in personal confidence and not assignable, it is quite apparent that H. C. Redington stands, in relation to the transaction which forms the foundation of this action, as if no such license had been given to Ely, Farr, and G. B. Redington, as is supposed. And so far as the license is concerned, we think it quite immaterial whether H. C. Redington had notice of the existence of the alleged nuisance or not. It could affect him in this respect neither injuriously nor beneficially. If the license did not pass to him, it is difficult to see how a want of notice could give it effect so as to enable H. C. Redington to shield himself under its authority. And we think it is entirely clear that it could not.

Carleton v. Redington.

It is further contended, on the part of the plaintiff, that the dam having settled and become ruinous, and the factory having been burnt, the defendants could not, without a new license, add to the height of the dam so as to raise the water as high as it was originally; that the license was merely a license to erect a dam of a particular height, but not to repair or restore it; and terminated with the decay of the dam. And the authorities would seem to show, that a license to erect a dam will give no right to repair and restore the dam when it has become ruinous and decayed, but is thereby determined. Mr. Chancellor *Kent* says, "If a parol license be granted for a temporary purpose, as the permission to erect a dam, it has been held to terminate with the decay of the dam; .as the purpose of the dam has been fulfilled." 3 Kent's Com. 451, and the cases there cited. The language of the court in *Cook* v. *Stearns*, 11 Mass. 533, seems strongly to countenance the doctrine, that a license to build a dam does not authorize the repair of it or its reërection. "If," say the court, "the defendant had a license from the former owners of the plaintiff's close, to make the bank, dam, and canal in their land, this extended only to the act done, but did not carry with it an authority, at any other time, to enter upon the land." The doctrine stated by Mr. Justice *Upham* in *Ameriscoggin Bridge* v. *Bragg*, 11 N. H. Rep. 102, is thus: "A license to erect a bridge for the taking of toll is clearly distinguishable from a mere consent of passing and repassing, and we think when it is once executed, it is either irrevocable while the bridge continues, or, if revocable at all, only so on full compensation of all expenditures made, and damages occasioned by such revocation. *Such a license may undoubtedly terminate by the decay of any erection under it,* and it would have terminated in this case, or might have been terminated, by the defendant when the first bridge became useless, had he so elected, or had the license been so limited." But, if it be holden that a license to erect a dam implies also a license to repair the same at pleasure, it would seem, from many authorities, that the license cannot be sustained. It is said, that such a license would give a permanent interest in the land on which the license was to be exercised, and

Carleton *v.* Redington.

that such an interest cannot be created by parol. A case in which this doctrine is laid down, in the most unequivocal terms, is that of *Stevens* v. *Stevens*, 11 Met. Rep. 251. In that case, a claim was set up by the defendant, of the right to enter upon the lands of the plaintiff at all times, to repair a dam thus erected by the defendant, under an alleged parol license, to enter to erect and repair said dam. And it was decided, that the claim could not be sustained, inasmuch as it was a claim of a permanent interest in the land of the plaintiff, and that no such interest can be created by parol. A similar doctrine was maintained in the case of *Cook* v. *Stearns*, 11 Mass. 533. The court say: "A permanent right to hold another's land for a particular purpose, and to enter upon it at all times without his consent, is an important interest, which ought not to pass without writing, and is the very object provided for by our statute." In *Mumford* v. *Whitney*, 15 Wendell, 330, it was held, that a license to do an act upon another's land, is valid; but that a parol agreement to allow a party to enter and erect a dam for a permanent purpose, was void within the statute of frauds, for the reason that it is the transfer of an interest in the land. The right claimed in this case to erect a dam, and at pleasure repair it, is a claim of right to perpetuate the dam, as well as the exercise of the right to flow the plaintiff's land, and in our opinion cannot be sustained in accordance with the provisions of the statute, or the law as established by the greater weight of authority.

There is still another ground upon which it is apparent that such a perpetual right to repair and maintain a dam, cannot be sustained. If the license be, in terms or legal effect, a license to erect and repair the dam when necessary, still, all that part of the license which relates to the repairs would be merely executory, and not executed; and so it would be revocable to that extent, according to all the authorities. No authority is found by us, which countenances the idea, that a license, not acted upon and executed without objection, is not revocable at the pleasure of the party giving the license. And it is well settled, that a license partially executed, is revocable so far as the same is not executed, and affords no protection to any one for acts

done after revocation. *Ruggles* v. *Lesure*, 24 Pick. 187. The foregoing is a strong case in point, that a license may be partially executed, and yet that, so far as it remains unexecuted, it is revocable. The plaintiff had entered into an agreement with the defendant, that he would throw a portion of his land into the highway if the defendant would move back the plaintiff's wall and prepare the road, and the defendant did set back the wall of the plaintiff, and while engaged in preparing the road by a removal of earth, the plaintiff forbade the removal of it; and it was held that the agreement was a mere license, and nothing more; that it gave the defendant the right to do certain acts upon the plaintiff's land, and was a full justification for all that was done upon it under the license, but that licenses are personal and revocable by the owner, at all times before they are exercised, and that the defendant was liable as a trespasser for all acts done after the license was thus revoked.

*Cook* v. *Stearns*, 11 Mass. Rep. 533, before cited, most distinctly recognizes a similar doctrine. The court say, " a license is technically an authority given to do some act, or a series of acts on the land of another, without passing any estate in the land. These are held revocable when executory, unless a definitive term is fixed, but irrevocable when executed. They amount to nothing more than an excuse for an act which would otherwise be a trespass. As to so much of the license as was not executed, it was countermandable." See also, 5 Dane's Abr. 577; *Crosby* v. *Wadsworth*, 6 East, 602; *Tillotson* v. *Preston*, 7 Johns. 285; *Johnson* v. *Carter*, 16 Mass. 443.

At the trial, the defendants contended that the action could not be maintained against Henry C. Redington for continuing the dam at the height at which it was in June, 1840, when he purchased, unless he was notified to remove or reduce it. In this branch of the case, two questions properly arise:

1. Was said Redington entitled to any notice to remove the timbers placed upon the dam in July, 1842, before this action could be maintained?

2. If he was entitled to notice, was it sufficient that he should have understood from the acts of the plaintiff in reference to the

flash-boards, or in any other respect, that the plaintiff was un-willing that the dam shall be continued ?

Now as to the first question, it is not open to doubt that no action could be maintained against H. C. Redington for permit-ting the dam to remain in the actual state in which he found it at the date of the purchase, until notified to remove or reduce it. So far as this question is concerned, the apparent, and not the real, state of his rights is to govern. What, then, was the actual state of the dam at that date ? The dam had settled and become ruinous as early as 1838, and had not been repaired. It appears only that "flash-boards, so called, were occasionally put upon the dam, after it became ruinous, in very low stages of the water, till 1842." The plaintiff's tenants and hired men at the mill complained to the plaintiff of the use of these boards, and he told them to take them off whenever they found them upon the dam ; and they did so in repeated instances. Ely and G. B. Redington, from whom H. C. Redington derives all his rights, several times applied to the plaintiff's tenants and to him, for leave to put on flash-boards, and permission was given sometimes to use them for a few days at a time in low water. Whether the flash-boards were upon the dam or not at the date of the convey-ance to H. C. Redington, does not appear. And we think it incumbent on him to make to appear the real state of the dam at that time. This certainly is not done. Flash-boards might or might not have been upon the dam. But that is not enough when he would shelter himself under his ignorance of the wrong done the plaintiff. If he would do that, he must first show the wrong to have been done, or the nuisance to have existed, at the time of the purchase, and then the plaintiff must have shown the de-fendant's knowledge of the wrong, and notice to him to remove the nuisance, before this action could be maintained.

But upon the uncontradicted evidence in this case on this point, the plaintiff was entitled to a verdict. In July, 1842, the defendants put upon the dam some sticks of timber, which raised the dam and water higher than was authorized by the deed. And it is not pretended that any such timbers were upon the dam at the time of the purchase in 1840. Here was a positive

Carleton *v.* Redington.

wrong done by reason of an erection by the other defendants and H. C. Redington himself. Here was a wrongful act of all the defendants. And the defendant H. C. Redington, was not entitled to any notice or request to remove this structure before the commencement of the action. No such timber was there when he purchased. If any thing was there at that time excepting the ruinous dam, it was flash-boards ; and they are not, as we have seen, shown to have been there. If flash-boards had been upon the dam at the date of the purchase by H. C. Redington, and of the elevation of the dam by means of the timbers, that would have given him no right to put on the permanent timbers in 1842, after the purchase. The fact that flash-boards were found there would not have entitled H. C. Redington to notice to remove the timbers.

In the second place, as to the notice, it is made a question whether if a notice was required, it was sufficient that H. C. Redington should have understood from the plaintiff's conduct that he was unwilling that the dam should be continued as it then was. The question arises upon the character of the notice. The sufficiency of the notice from the manner of it, and not the fact of notice, is the point to be decided.

It is to be assumed, that from the conduct of the plaintiff in regard to the removal of the flash-boards, and in other respects, the defendant well understood that the plaintiff denied the right of the defendant to keep the flash-boards upon the dam and was unwilling that it should be done, and desired their removal. And we are of the opinion that was a sufficient notice. No particular form of notice is required in such case. It is not required to be by writing. It may be written or verbal, or by acts clearly giving the party notice of the claim for a removal of the nuisance. Here was an actual removal of the flash-boards by Carleton and his agents, and full knowledge on the part of H. C. Redington of the plaintiff's objection to their restoration. What further notice could be necessary, or reasonably required, than an actual removal of the nuisance and full information, from the plaintiff's acts, of his unwillingness that it should be restored ? Any thing more would be wholly unnecessary to answer the object of the law requiring the notice at all.

In *Bunker* v. *Bunker*, decided in Belknap county, December term, 1847, one question was as to the sufficiency of the notice to the defendant to remove the alleged nuisance. The action was case for flowing the plaintiff's land. The defendant had drawn down the water from the plaintiff's land. The plaintiff verbally "forbade the defendant to flow the land again." This was held sufficient. The court held that no particular form is required by law, in which such notice is to be given. It must undoubtedly be so distinctly and definitely made, as that the person to whom it is addressed shall fully understand the ground of complaint, and that the party is unwilling that the nuisance should be continued, and that he desires its removal.

And we are all of the opinion that this is all that is required, and that it is immaterial whether such notice and information be brought home to the knowledge of the party by acts or by words. For the purposes of this case, it is not necessary to determine the question, whether Henry C. Redington, by virtue of the deed to him, of June 24th, 1840, was connected with, or took any interest in, the grant of the plaintiff, of June 23d, 1835.

The judgment of the court is, that the verdict must be set aside and

*A new trial granted.*